# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**KAREN A. WYLE**
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| K.L., | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 29A02-1308-MI-681 |
| | ) | |
| E.H., | ) | |
| | ) | |
| Appellee. | ) | |

APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable Steven R. Nation, Judge
Cause No. 29D01-1301-MI-446

**April 9, 2014**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

K.L. ("Mother") appeals the trial court's order granting the petition for visitation filed by E.H., the paternal grandfather of Mother's child. Mother raises two issues which we revise and restate as:

I.    Whether the trial court abused its discretion in excluding certain evidence; and

II.   Whether the trial court abused its discretion in granting the paternal grandfather's petition for visitation.

We affirm.

FACTS AND PROCEDURAL HISTORY

On May 22, 2009, Mother and W.L. married, and they legally separated in November 2010. In April 2011, Mother and L.H. ("Father") began a relationship and at some point Mother became pregnant. Mother and W.L. divorced on September 2, 2011. Father's father, E.H. ("Grandfather"), and his family welcomed Mother, and Mother went to Grandfather's house on occasion during that time.

On October 15, 2011, Father committed suicide. Immediately following Father's death, Grandfather did not have much contact with Mother due to the devastating nature of the loss.

On October 28, 2011, Mother filed a verified petition to establish paternity. The petition alleged that Mother was pregnant, the child was due on April 13, 2012, that she was not married to Father or anyone else at the time of conception, that Father was the father of the child, and that his date of death was October 15, 2011. The petition also requested that the coroner be ordered to hold a sample of Father's DNA so that genetic testing could be completed upon the child's birth.

2

On December 27, 2011, Mother moved back in with W.L. On December 28, 2011, Grandfather asked Mother to come to his house so they could talk, and Mother and B.S. went to Grandfather's house in early 2012. Grandfather apologized for not contacting sooner. On March 10, 2012, Mother had a baby shower and she invited Grandfather's family, and Z.H., Grandfather's wife. Grandfather and Z.H.'s daughters attended.

On April 4, 2012, Mother gave birth to L.L. Mother texted Grandfather the following day and invited him and his family to visit with L.L. Grandfather and Z.H. visited Mother and L.L. in the hospital. In early June 2012, Mother brought L.L. to Grandfather's house. After that visit, Grandfather requested on multiple occasions to see L.L. again via text messages, but Mother did not grant any of Grandfather's requests. Grandfather also requested a picture of L.L., but Mother did not provide one.

On August 16, 2012, Grandfather filed a verified motion to intervene in the paternity action alleging that he was Father's father and L.L.'s paternal grandfather. The motion alleged that Father was a Navy veteran and L.L. may be entitled to both Social Security and military benefits. The motion also stated that Grandfather desired visitation with L.L.

On October 8, 2012, the court entered a paternity decree finding that Father was L.L.'s biological father. On January 17, 2013, Grandfather filed a verified petition for grandparent visitation.

On January 25, 2013, the court held a hearing regarding Grandfather's petition for visitation. Z.H. testified that she raised her and Grandfather's five children together, that she works for Noblesville Schools as a special education teacher, and that she was

3

supportive of Grandfather obtaining visitation. Grandfather testified that he works for the Department of Homeland Security, that his family welcomed Mother when she and Father were in a relationship, that he has a close-knit family, and that he did not have much contact with Mother shortly after Father died because he needed time to grieve. Grandfather testified that he apologized for not contacting Mother sooner during his visit with her in early 2012. He explained that it was a delicate situation because he wanted to be involved with L.L. but did not want to impose on Mother. He further stated that he took care of his children on his own for two to three years, changed their diapers, bathed them, and fed them.

After hearing the testimony of Z.H. and Grandfather, the court indicated that it wanted the parties to speak with a family counselor or therapist. The court compared the arrangement with civil mediation and said that neither party could bring the mediator into court to testify as to what was discussed during the mediation and also informed the parties that anything that they said during counseling would be completely confidential. The court required Grandfather to be responsible for the cost of the family therapist.

On February 11, 2013, the court entered an order requiring the parties to participate in counseling with a counselor/therapist agreed upon by the parties or appointed by the court if the parties were unable to agree. The order stated that it was the court's hope that the parties could settle the matter without further court intervention. On March 6, 2013, Grandfather filed a request for the court to appoint a counselor/therapist, and the court later appointed Mary Halladay.

The mediation was unsuccessful, and the court held another hearing on May 3, 2013. Halladay filed a letter with the court, Grandfather filed a motion to strike the letter,

and the court granted Grandfather's motion. At the beginning of the hearing, Mother's counsel moved to introduce the testimony of Halladay, which the court denied. Specifically, the court indicated that it sent the parties to a counselor in the form of a mediation and it wanted the parties to be free to discuss things without the fear of the counselor coming back into court and testifying. Mother's counsel then stated that he would not ask Halladay what was said by the parties and that Halladay would have testified that Grandfather terminated the counseling, that progress was being made, and that she felt if they would have continued they could have developed the trust necessary to make a functioning and workable agreement.

B.S. testified that Mother was stressed about the fact that she may have to share L.L. "with somebody who she doesn't have a relationship with," and that the visit with Grandfather in early 2012 was very awkward and Grandfather spoke very little. Id. at 64.

Mother testified that she lives with W.L. and L.L. and works as an independent subcontractor performing in-home interventions with autistic children on Mondays through Thursdays from about 8:15 until 4:00 or 5:00 and every other Friday from 9:00 until 5:00. Mother stated that she had four or five face-to-face interactions with Grandfather at family gatherings prior to Father's death at which she maybe said "hi, hello," but did not really converse with him. Id. at 79. She expressed concern with the dynamics within Grandfather's family and that the relationship between Grandfather and his daughter did not seem very warm. She described Grandfather as void of emotion, and said that the visit in June with him and L.L. was uncomfortable because he was not really talking to her and it was Z.H. who was mainly spearheading the conversation. Mother expressed worry that Grandfather would cause something negative in her relationship

5

with L.L. and a "big fear" was that the "opportunity to tell [L.L.] when and if about her biological father [would] be taken out of [her] hands." Id. at 85-86. Mother stated:

> I have limited time with my daughter. She's so young that she goes to bed so early and I have to work in order to provide for her, which I know is no, that's not an exception, a lot of parents have to do that. But then my weekends are my time to be with her. It's my time to bond with her and to create this amazing environment and life that I want for her. So I feel that by having to interrupt that and then give her to somebody else, it's just going to upset the balance that I'm trying so desperately to establish.

Id. at 86-87. Mother expressed that she still firmly had trust issues with Grandfather and described him as a stranger to her. She went on to say that L.L. has to have a special kind of putty inserted into her ears before taking a bath or being around water and she did not have enough interaction with Grandfather to be able to say whether she had concerns with him following directives, that Z.H. had displayed a strong personality, and she did not know if her wishes would be honored.

On July 15, 2013, the court granted Grandfather's petition for visitation. In addition to making findings regarding the facts previously mentioned herein, the court in its order stated in part:

4.      . . . Father and Mother resided together the summer of 2011 during which time [L.L.] was conceived. While together, Father and Mother attended family functions at Grandfather's home or otherwise with Grandfather's family. The evidence reflects that Father and Mother remained on good terms throughout their relationship. . . .

5.      On October 15, 2011, [Father] died by suicide. . . . [Father] had a close relationship with his [Grandfather]. The relationship between Grandfather and Mother was, prior to [Father's] passing, cordial but not particularly close which appears, in part, to be the result of the brevity of Mother and Father's relationship.

* * * * *

6

10. The day after the child's birth, April 5, 2012, Grandfather and members of Father's family met with Mother at the hospital to celebrate the delivery of the child. This occurred as a result of Mother's own invitation.

11. Subsequently, on June 2, 2012, or 5, 2012, Mother brought [L.L.] over to Grandfather's home to visit.

12. Grandfather has requested of Mother on multiple occasions to have further contact and visitation with [L.L.], however, Grandfather's requests were either ignored or denied by Mother without explanation. Grandfather's requests were all made by text messaging. Mother states that she received no invitations by personal phone calls. This demonstrates to the court an awkwardness in the relationship between Mother and Grandfather.

13. Both Mother and Grandfather reside in Noblesville, Indiana.

\* \* \* \* \*

16. Grandfather is the biological father of three children and step-father of two children. Grandfather has extensive experience in caring for and raising children and holds many family gatherings and functions at his home. Grandfather describes his family as being "close knit."

17. Between the hearings on January 25, 2013 and May 3, 2013, the parties, at the court's direction, attempted to mediate a resolution of this matter with a trained family therapist. The court believed that there were many emotional issues that needed to be addressed between the parties including Father's passing, the failure of the parties to address Father's passing together, a lack of communication, and how, when, and under what circumstances [L.L.] would learn of Father. Those efforts at mediation and counseling were not fruitful to resolve the matter at hand.

18. Grandfather requested of Mother that she provide him with a picture of [L.L.] after [L.L.'s] first birthday. Mother denied Grandfather's request.

\* \* \* \* \*

20. Mother suffers from and has been treated for anxiety and depression since 2009.

21. Mother has not prevented but has fostered a close relationship with [L.L.'s] maternal grandmother and other maternal family members. [L.L.] sees her maternal grandmother weekly, an aunt weekly, another aunt every two to three weeks, a cousin two times weekly. Mother allows [L.L.] visit [sic] with [W.L.'s] father and stepmother every two weeks, and [W.L.'s] mother occasionally. Mother has not pursued or fostered a relationship with Grandfather . . . because, according to Mother, she doesn't know Grandfather very well and has had limited contact with him. The court affords little to no weight to other concerns expressed by Mother as to why she desires that Grandfather have no contact with [L.L.].

22. It appears to the court that Mother desires to move on with her life and erase both from her memory and the child's knowledge any connection to Father, Grandfather and his family. There is some indication that Mother's former husband, with whom Mother now resides, desires that Mother not resume any further contact with Grandfather or Grandfather's family.

23. Grandfather expresses that he has no desire to interfere with Mother's ability to parent [L.L.] and respectfully recognizes that Mother must move on from her emotional attachment to [Father]. He expresses an admirable sense of obligation to [L.L.] as a grandparent especially in light of Father's passing. He understands that his visitation would initially be limited and possibly supervised by Mother so that [L.L.] would experience no detachment from Mother. According to Grandfather, he ideally would like to see [L.L.] every weekend for a couple of hours and for frequent family gatherings.

24. [L.L.] appears to be a normal and healthy child. There is no evidence that [L.L.] would be unsafe in Grandfather's care or that Grandfather's contact would negatively influence [L.L.]. On the contrary, it appears to the court that Grandfather and his family could and would provide the child with meaningful familial relationships and experiences that would be in the child's best interest.

25. Pursuant to I.C. 31-17-5-1, grandparents are permitted to seek visitation rights. Grandfather properly filed his petition pursuant to I.C. 31-17-5-3 and this court is the proper venue for grandparents' visitation proceedings pursuant to I.C. 31-17-5-4.

26. The court may grant a grandparent visitation rights if the court determines visitation rights are in the best interest of the child. I.C. 31-17-5-2(a).

27. I.C. 31-17-5-1 et. seq. ("the Grandparent Visitation Act") represents a legislative recognition that, "'a child's best interest is often served by developing and maintaining contact with his or her grandparents.'" *In re: K.I*[.], 903 N.E.2d 453, 462 (Ind.[ ] 2009) (citing *Swartz v. Swartz*, 720 N.E.2[d] 1219, 1221 ([Ind. Ct. App.] 1999). See also *Spaulding v. Williams*, 793 N.E.2d 252, 256 ([Ind. Ct. App.] 2003) citing *McCune v. Frey*, 783 N.E.2d[ ]752, 755 ([Ind. Ct. App.] 2003).

28. The Grandparent Visitation Act contemplates only occasional, temporary visitation that does not substantially infringe on a parent's fundamental right to control the upbringing, education, and religious training of their children. *In re: K.I.*, 903 N.E.2d, at 462 (internal citations omitted).

29. In drafting the Act, "the legislature balanced two competing interests: 'the rights of the parent to raise their children as they see fit and the rights of grandparents to participate in the lives of their grandchildren.'" *Id.* (quoting *Swartz*, 720 N.E.2d at 1222).

30. The court has considered 1) the presumption that a fit parent acts in his or her child's best interests; 2) the special weight that must be given to a fit parent's decision to deny or limit visitation; 3) whether the grandparent has established that visitation is in the child's best interests; and 4) whether the parent has denied visitation or has simply limited visitation. The court has also considered whether Grandfather has had or has attempted to have meaningful contact with the child. See, *Spaulding*, 793 N.E.2d at 257; I.C. 31-17-5-2(b).

31. Though the court must presume that a fit parent acts in her child's best interests, the presumption is rebuttable, and grandparents bear the burden of rebutting the presumption. *Id.* at 258.

32. The court is not required to accept a parent's reasons for denying or restricting visitation with grandparents as necessarily true. *Id.* See also, *Hicks v*[.] *Larson*, 884 N.E.2d 869, at 875 [(Ind. Ct. App. 2008), <u>trans.</u> <u>denied</u>].

9

33.	It is in [L.L.'s] best interest for [her] to know her heritage, and to be exposed to and enjoy the family relationships and values of her paternal Grandfather.

34.	It is in [L.L.'s] best interest that she have contact and visitation with Grandfather and that Grandfather's request for visitation be granted as provided herein.

35.	All Findings of Fact are incorporated by reference as Conclusion of Law and all Conclusions of Law are incorporated by reference as Finding of Fact.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Grandfather's Petition is hereby granted and Grandfather is granted visitation as follows:

1.	The Grandfather shall have four hours of visitation with [L.L.] each month.  Visitation shall take place on the second and forth [sic] Sunday of each month, two hours in duration each visit.  The visitation shall be supervised by the Mother for the first two months.  Thereafter said visitation shall be unsupervised.  In the event any visitation Sunday is a holiday, the Grandfather's visitation shall occur the following Sunday.  After four months, the visitation will increase to three hours in duration each visit.

2.	Unless the parties otherwise agree, all visitation shall take place and all exchanges of the child shall take place at the Grandfather's home.  Further, all visitation shall take place from 1:00 p.m. to 3:00 p.m. each Sunday, unless the parties otherwise agree.

3.	The Grandfather and Mother shall refrain from making negative or disparaging comments about the other and shall not make any such remarks in the presence of [L.L.].  The court encourages the parties to communicate verbally as well as through email and texting.

4.	Grandfather may inform [L.L.] that he is her grandfather but shall not otherwise advise [L.L.] that his son . . . is her father at this time and without further order.  If the child should make an inquiry about her biological father, the question is to be deferred to Mother.  Mother is encouraged to develop a plan as to how and when she will advise [L.L.] about her father.  When the child is older and the issue arises, and a plan is not otherwise discussed and implemented between Mother and Grandfather, the matter should be first addressed between the parties and with a child counselor and then presented to the court if an agreement is not reached.

10

5. The Grandfather shall have additional visitation with [L.L.] as he and the Mother agree.

6. Both the Grandfather and the Mother shall each bear their own expenses in attorney fees in this matter.

7. The court anticipates that if Grandfather's visitation is faithfully exercised and as the child matures, a modification with increased parenting time may be warranted.

Appellant's Appendix at 5-11.

## DISCUSSION

Before addressing Mother's arguments, we observe that Grandfather did not file an appellee's brief. When an appellee fails to submit a brief, we do not undertake the burden of developing appellee's arguments, and we apply a less stringent standard of review, that is, we may reverse if the appellant establishes *prima facie* error. Zoller v. Zoller, 858 N.E.2d 124, 126 (Ind. Ct. App. 2006). In this context, *prima facie* error is defined as "at first sight, on first appearance, or on the face of it." Orlich v. Orlich, 859 N.E.2d 671, 673 (Ind. Ct. App. 2006). This rule was established so that we might be relieved of the burden of controverting the arguments advanced in favor of reversal where that burden properly rests with the appellee. Wright v. Wright, 782 N.E.2d 363, 366 (Ind. Ct. App. 2002). However, questions of law are still reviewed *de novo*. McClure v. Cooper, 893 N.E.2d 337, 339 (Ind. Ct. App. 2008).

## I.

The first issue is whether the trial court abused its discretion in excluding Halladay's testimony. Mother argues that the court made it clear that it did not intend to order mediation subject to the Rules of Alternative Dispute Resolution. She contends

that evidence that Grandfather sabotaged the alternative process ordered by the court and prevented the development of a relationship that would have made any visitation order less damaging and disruptive was clearly relevant to whether Grandfather could be relied upon to put L.L.'s best interests above his own.

Mother also asserts that even if the settlement proceedings were treated as mediation subject to the Rules of Alternative Dispute Resolution, neither those rules nor the Rules of Evidence would require or justify excluding evidence of Grandfather's behavior in walking out of the therapy sessions. Mother argues that the confidentiality rules focus on liability and are inappropriate and damaging where a child's welfare is involved, and that Grandfather terminated all efforts at compromise at a time when a trained counselor believed they were likely to bear fruit. Mother maintains that any public policy served by keeping a party's behavior in settlement discussions confidential must give way to the need to assess behavior and temperament of an adult who seeks to be put in charge of a child.

The admission of evidence is entrusted to the sound discretion of the court. In re A.J., 877 N.E.2d 805, 813 (Ind. Ct. App. 2007), trans. denied. We will find an abuse of discretion only where the court's decision is against the logic and effect of the facts and circumstances before the court. Id. If a court abuses its discretion by admitting the challenged evidence, we will reverse for that error only if the error is inconsistent with substantial justice or if a substantial right of the party is affected. In re S.W., 920 N.E.2d 783, 788 (Ind. Ct. App. 2010).

At the time of the hearing, Ind. Evidence Rule 402 provided that "[a]ll relevant evidence is admissible, except as otherwise provided by the United States or Indiana

constitutions, by statute not in conflict with these rules, by these rules or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible." (Subsequently amended effective January 1, 2014).[1] Ind. Evidence Rule 408, which governs compromise offers and negotiations, provided in part:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise a claim, which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution. Compromise negotiations encompass alternative dispute resolution.

(Subsequently amended effective January 1, 2014).[2]

---

[1] Ind. Evidence Rule 402 now provides:

Relevant evidence is admissible unless any of the following provides otherwise:

    (a)    the United States Constitution;
    (b)    the Indiana constitution;
    (c)    a statute not in conflict with these rules;
    (d)    these rules; or
    (e)    other rules applicable in the courts of this state.

Irrelevant evidence is not admissible.

[2] Ind. Evidence Rule 408 now provides in part:

Evidence of the following is not admissible on behalf of any party either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:

    (1)    furnishing, promising, or offering, or accepting, promising to accept, or offering to accept a valuable consideration in order to compromise the claim; and

    (2)    conduct or a statement made during compromise negotiations about the claim. Compromise negotiations include alternative dispute resolution.

13

Ind. Alternative Dispute Resolution Rule 1.2 provides that "[a]lternative dispute resolution methods which are governed by these rules are (1) Mediation, (2) Arbitration, (3) Mini-Trials, (4) Summary Jury Trials, and (5) Private Judges." Ind. Alternative Dispute Resolution Rule 2.11 provides:

> Mediation shall be regarded as settlement negotiations as governed by Ind. Evidence Rule 408.
>
> * * * * *
>
> Mediation sessions shall be closed to all persons other than the parties of record, their legal representatives, and other invited persons.
>
> *Mediators shall not be subject to process requiring the disclosure of any matter discussed during the mediation, but rather, such matter shall be considered confidential and privileged in nature.* The confidentiality requirement may not be waived by the parties, and an objection to the obtaining of testimony or physical evidence from mediation may be made by any party or by the mediators.

(Emphasis added).

The Indiana Supreme Court has recently held that "Indiana policy *strongly favors* the confidentiality of *all matters* that occur during mediation." Horner v. Carter, 981 N.E.2d 1210, 1211 (Ind. 2013) (emphases added). The Court also held that "Indiana judicial policy strongly urges the amicable resolution of disputes and thus embraces a robust policy of confidentiality of conduct and statements made during negotiation and mediation." Id. at 1212.

The trial court made it clear to the parties that their statements made during mediation would be confidential and that the mediator could not testify. Among other statements emphasizing the confidentiality of the sessions, the court stated:

> I haven't heard all the evidence. I would like for the two of you to speak with a family counselor or therapist that the two of you can mutually

agree on, and feel comfortable that what you express to the counselor would be completely confidential. In other words, I'm viewing this as, in civil cases we have mediation where both parties go to mediation. What's discussed at mediation stays at mediation. Nobody can bring that mediator back into court to testify as to what was discussed during the mediation. I think it would be helpful as what I'm considering to be somewhat of a family unit, the two of you, meet with a family counselor and be able to bare your concerns to that counselor without any fear of that being used in court, the counselor coming back and testifying. I would not permit it, I would not allow it. Anything that you would say during counseling would be completely confidential and I would hope would be helpful though in perhaps the two of you at least understanding each other's concerns and positions and then seeing if the two of you can't reach a mutual agreement.

Transcript at 48-49.

The court stressed several times that it would not entertain any testimony by the counselor and that Indiana's policy strongly favors confidentiality of all matters that occur during mediation. We cannot say that the trial court abused its discretion in excluding the testimony Mother wished to elicit from Halladay.

## II.

The next issue is whether the trial court abused its discretion in granting Grandfather's petition for visitation. A child's relationship with her grandparents is important, and can deserve protection under the Grandparent Visitation Act. In re Visitation of M.L.B., 983 N.E.2d 583, 584 (Ind. 2013). But grandparent-visitation orders necessarily impinge, to some degree, on a parent's constitutionally protected rights. Id. An order granting grandparent visitation must therefore include findings that address four well-settled factors for balancing parents' rights and the child's best interests, and must limit the visitation award to an amount that does not substantially infringe on parents' rights to control the upbringing of their children. Id.

15

The United States Supreme Court has broadly agreed that natural parents have a fundamental constitutional right to direct their children's upbringing without undue governmental interference, and that a child's best interests do not necessarily override that parental right. Id. at 586 (citing Troxel v. Granville, 530 U.S. 57, 120 S. Ct. 2054 (2000)). Ind. Code § 31-17-5-6 governs the decree on a petition for grandparent visitation and provides: "Upon hearing evidence in support of and opposition to a petition filed under this chapter, the court shall enter a decree setting forth the court's findings and conclusions." Although the amount of visitation is left to the sound discretion of the trial court, the Grandparent Visitation Act contemplates only occasional, temporary visitation that does not substantially infringe on a parent's fundamental right to control the upbringing, education, and religious training of their children. In re K.I., 903 N.E.2d 453, 462 (Ind. 2009).

Because the Grandparent Visitation Act requires specific findings of fact and conclusions of law under Ind. Code § 31-17-5-6, we apply the two-tiered Indiana Trial Rule 52 standard of review. M.L.B., 983 N.E.2d at 585. We first determine whether the evidence supports the findings, and then whether the findings support the judgment. Id. We set aside findings of fact only if they are clearly erroneous, deferring to the trial court's superior opportunity to judge the credibility of the witnesses. Id. In turn, a judgment is clearly erroneous when the findings fail to support the judgment or when the trial court applies the wrong legal standard to properly found facts. Id.

In striking a balance between parental rights and children's interests, a plurality of the United States Supreme Court discussed several key principles in Troxel, which

16

Indiana courts have distilled into four factors that a grandparent-visitation order should address:

> (1)    a presumption that a fit parent's decision about grandparent visitation is in the child's best interests (thus placing the *burden* of proof on the petitioning grandparents);
>
> (2)    the "special weight" that must therefore be given to a fit parent's decision regarding nonparental visitation (thus establishing a heightened *standard* of proof by which a grandparent must rebut the presumption);
>
> (3)    "some weight" given to whether a parent has agreed to some visitation or denied it entirely (since a denial means the very *existence* of a child-grandparent relationship is at stake, while the question otherwise is merely how much visitation is appropriate); and
>
> (4)    whether the petitioning grandparent has established that visitation is in the child's best interests.

Id. at 586 (citing McCune v. Frey, 783 N.E.2d 752, 757-759 (Ind. Ct. App. 2003)). The "special weight" requirement does not require a trial court to take at face value any explanation given by a parent. Spaulding v. Williams, 793 N.E.2d 252, 260 (Ind. Ct. App. 2003). The trial court must exercise the same duties it has in any other matter pending before it, namely, the duties of weighing the evidence and judging witness credibility. Id. Accordingly, it is the trial court's prerogative to listen to the evidence and determine whether a parent's alleged justification for denying or restricting visitation with grandparents holds water. Id.

In K.I., the Indiana Supreme Court approved of the four factors stated in McCune and took the additional step of declaring that a grandparent-visitation order "*must* address" those factors in its findings and conclusions. M.L.B., 983 N.E.2d at 586 (quoting K.I., 903 N.E.2d at 462). "[T]rial courts must consider all four Troxel

17

principles, as distilled by McCune and made mandatory by K.I." Id. The court in McCune stated:

> It is important for parties and the reviewing court to have a clear understanding of how and why the trial court made its decision. It is particularly imperative in a grandparent visitation case because of the tension between a parent's fundamental right to control the upbringing of his or her child, and the fact that a child's best interests are "often served by developing and maintaining contact with his or her grandparents."

783 N.E.2d at 757. "[I]t will not be enough to merely recite those factors, unless there is also analysis of how the evidence as weighed by the trial court fits within that framework." M.L.B., 983 N.E.2d at 589.

Mother argues that the only evidence supporting Grandfather's petition is the size and closeness of his extended family and his experience in taking care of young children, and that the facts in favor of Grandfather are weaker than the facts that were found insufficient in Troxel. She contends that Grandfather showed no interest in learning anything about Mother's values, that Grandfather's request of weekend visitation did not demonstrate that he did a better job than Mother of putting L.L.'s needs first given that Mother works essentially a full-time weekday schedule, and that further expanding L.L.'s family circle is an insufficient basis for overruling a fit custodial parent's decisions. Mother asserts that even if her failure to respond to Grandfather's requests after June 2012 is deemed a denial of visitation, that fact does not invalidate the constitutionally required presumption that she is acting in L.L.'s best interests. She notes that Grandfather did not present any evidence that he has the ability or experience to cope with L.L.'s tubes in her ears that were implanted to rectify a series of ear infections, and posits that injecting Grandfather into L.L.'s life will prematurely raise the subject of

18

L.L.'s father and force Mother to discuss it with L.L. far earlier than she deems best. Mother also argues that there was no evidence that Mother's planned schedule for acquainting L.L. with her biological origins would be in any way detrimental to L.L.'s best interest and that the trial court violated her fundamental parental rights and abused its discretion by overruling her on this crucial choice.

To the extent that Mother contends that similar facts were found insufficient in Troxel, we disagree. In Troxel, the Court noted that there was no allegation that the parent ever sought to cut off visitation entirely. 530 U.S. at 71, 120 S. Ct. at 2062-2063. The Court observed that the trial court made only two formal findings in support of its visitation order: (1) the grandparents were part of a large, central, loving family, all located in the area, and the grandparents could provide opportunities for the children in the areas of cousins and music; and (2) the children would benefit from spending quality time with the grandparents, provided that that time is balanced with time with the children's nuclear family. Id. at 72, 120 S. Ct. at 2063. The Court held that these "slender findings" in combination with the trial court's announced presumption in favor of grandparent visitation and its failure to accord significant weight to mother's already having offered meaningful visitation to the grandparents, demonstrated that the case involved nothing more than a simple disagreement between the trial court and mother concerning her children's best interests. Id.

Unlike in Troxel, the trial court here acknowledged the presumption that a fit parent acts in his or her child's best interests as well as the other three required factors. Further, the court acknowledged that members of Father's family attended a baby shower for L.L., that Mother invited Grandfather and members of his family to the hospital, and

that Mother brought L.L. to Grandfather's home to visit in early June, but the court also found that Grandfather had made multiple requests to have further contact with L.L. and Mother ignored or denied these requests. The trial court's eight-page order detailed Father and Mother's relationship, Grandfather's extensive experience in caring for and raising children, and Grandfather's close-knit family. The court afforded little to no weight to some of the concerns expressed by Mother as to why she desires that Grandfather have no contact with L.L. The court also found that there was no evidence that L.L. would be unsafe in Grandfather's care and that Grandfather and his family could and would provide L.L. with meaningful familial relationships and experiences that are in L.L.'s best interest. Under the circumstances, we cannot say that the trial court abused its discretion in granting Grandfather's petition.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's order.

Affirmed.

BARNES, J., concurs.

ROBB, J., concurs in part and dissents in part with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| K.L., | ) | |
| | ) | |
|     Appellant, | ) | |
| | ) | |
|       vs. | ) | No. 29A02-1308-MI-681 |
| | ) | |
| E.H., | ) | |
| | ) | |
|     Appellee. | ) | |

**ROBB, Judge, concurring in part, dissenting in part**

I concur in the majority's decision regarding the evidentiary issue, but respectfully dissent from the decision to affirm without reservation the grandparent visitation order. I do not necessarily disagree with the majority's decision that the trial court did not abuse its discretion in granting Grandfather's petition for grandparent visitation with L.L. This is especially so given the circumstances in which Father is deceased and without Mother's consent and willing participation, there is no other option for Grandfather to have a relationship with L.L. However, I do not believe the trial court gave appropriate consideration to Mother's specific concerns, nor do I believe the visitation schedule imposed by the trial court is crafted to meet L.L.'s best interests.

A trial court is required to give special weight to a fit parent's decision regarding grandparent visitation. In re Visitation of M.L.B., 983 N.E.2d 583, 586 (Ind. 2013).

There is no indication Mother is not a "fit" parent, and yet the trial court here specifically stated that it gave "little to no weight" to Mother's concerns about visitation between L.L. and Grandfather. See slip op. at 8 (quoting trial court's order at paragraph 21). Although the trial court properly considered the other three required factors, its failure to give appropriate weight to this factor troubles me. In addition, at this point, L.L. is two years old and has had no relationship with Grandfather since her early infancy. Two is a difficult age under the best circumstances, and L.L.'s visitation with a virtual stranger will likely be trying enough on its own merits. To also order that visitation to automatically go from being supervised by her mother to unsupervised after only four visits, and further to order the visitation to automatically increase from two hours twice a month to three hours twice a month after just sixteen visits is, in my opinion, an abuse of discretion and contrary to the child's best interests, especially in light of Mother's reluctance to allow visitation at all.

I would remand for the court to revise its order to visitation of two hours twice a month under the supervision of Mother, with any modifications to that arrangement to be made only after a report to the court and a finding that unsupervised or additional visitation is appropriate to these particular parties and this particular situation.